## No. 9788.

### ANGELO SOCOLA VS. CHESS-CARLEY COMPANY.

A dealer in petroleum fluids, who fills an order for a barrel of "Puroline" by delivering a barrel of "Gasoline" of 74° gravity, and brands the package as "Puroline," is not guilty of deception, as the difference in the dangerous character and in the use of the two fluids is hardly measurable or perceptible; and the package containing the stamp "explosive and dangerous," placed thereon by the inspector under the provisions of Act No. 37 of 1877, regulating the mode of inspecting coal and petroleum oils or fluids.

In a case of a fire originating from the package of such goods, from which oil is drawn in the night by persons who enter the room with a burning lantern, the dealer will not be held responsible for the damages resulting from such fire.

Positive testimony on a given point always predominates over negative testimony on the same point.

APPEAL from the Civil District Court for the Parish of Orleans. *Tissot*, J.

---

*E. H. McCaleb* and *T. J. Semmes & Legendre* for Plaintiff and Appellant:

1. The vendor of illuminating oils is liable to the vendee in damages for the destruction of property by fire caused by the volatilization and ignition of a barrel of gasoline sold as "puroline." R. C. C. Art. 2445; Addison on Torts, pp. 850 and 851; 18 Ann. 232; Thomp-

son on Negligence, vol. i, pp. 232 and 236. The vendor who is a dealer in dangerous agencies liable, though ignorant of the vices of the thing sold. Pothier, Contrat de Vente, Part II, Chap. 1, Nos. 203, 213, 214 ; 2 Ann. R. Q. B., div. 102. The buyer may recover damages for injuries which result from selling property with a false warranty. Sutherland on Damages, vol. 2, p 435; Laurent, Tome 24, Nos. 294 and 295 ; 2 M. & W., 519 ; 4 M. & W. 337 ; Bonnin et Julien c, Gabriel, Dalloz, 1873, p. 55 ; L. R. 5 Ex. 1 ; 2 Selden 397 ; 11 Allen 579. A dealer in oil is responsible for injuries caused by an explosion. 104 Mass. 64.

2. The article ordered, "puroline," and the article delivered, gasoline, of a high specific gravity and very dangerous, are materially different, and the defendants are estopped from asserting their identity, because (1) of the statements contained in the charter of the "Insurance Oil Tank Co.," of which they are the controlling stockholders ; (2) by representing and selling puroline as a patented article ; (3) by their circulars ; and (4) by their price-cards, in which they are called by different names and sold at different prices. In dangerous agencies mere resemblance is not sufficient—absolute identity is requisite when the article sold is likely to do harm to life or property. 27 A. 713 ; Lewin's Cro. Cas. 169. Stockholders are bound by the acts and representations of the corporation or its agents. 17 Wall, 623 ; § 17, Freeman on Judgments ; 13 Ann. 259 ; 28 Ann. 204; 18 How. 331 ; § 139, Boone on Corporations ; Bigelow on Estoppel, chap. XIX, p. 473 ; H. D. p. 512, No. 6.

3. The defendant had no right to counterfeit the trade-mark "Puroline," belonging to the Insurance Oil Tank Company, upon the barrel of gasoline shipped to plaintiff, and which caused the damage complained of. The unauthorized use of this trade-mark was a fraud upon the purchaser. 33 Ann. 953; 24 Ann. 99; Sutherland on Damages, vol. 3, p. 629. An implied warranty is imposed on the vendor who sells an article with a trade-mark. Benjamin on Sales, p. 495; Pardessus, vol. 1, p. 126, No. 110; ib. 189, No. 163. A purchaser can maintain an action for deceit against his vendor for selling him an article under a false trade-mark. Croke's Jacobus ; Upton on Trade-marks, pp. 10 and 11; Browne on Trade-marks, par. 63, 64, pp. 40, 41 and 42.

4. The barrel delivered by defendant was not branded " *Dangerous and Explosive,*" as required by the laws of this State (Act 37, Ex. Ses. 1877, p. 60), and was shipped on a passenger vessel, in violation of the penal statutes of the United States. Rev. Stats. of the U. S., secs. 4474, 4476. These statutes are State inspection laws, passed under the police power. 9 Wall. 141; 97 U. S. 504.

5. Defendants having suppressed and withheld the testimony of their clerk, who received the order for, and the drayman who hauled, the barrel of fluid in question, every presumption must be taken against them. 2 Ann. 288; 6 Ann. 166; 35 Ann. 694.

6. The defendant cannot set up plaintiffs alleged contributory negligence as an excuse, because (1) they committed unlawful acts in failing to have the barrel marked as required by the State statute, and in shipping it in violation of the act of Congress, and (2) because they threw plaintiff off his guard. Par. 22 and 23, Beach on Contributory Negligence, pp. 69, 70 and 71 et seq. ; Thompson on Neg., vol. 1, p. 344; 9 Md. 108 ; 37 Ann. 31.

*White & Saunders* for Defendant and Appellee :

The 13th paragraph of Art. 3556 defines the term "fault." Now this term "fault" is used in quite a number of Articles of the Code, as a general term denoting both intentional and unintentional violation of another's right. For example, Art. 2721 declares that the lessee is liable for injuries to the thing leased, sustained " through his fault." In Arts. 2071-2-3, relative to alternative obligations, " fault " is again used to denote either intentional or unintentional wrong doing. So, in Art. 1958, which declares that contracts are interpreted against him through whose " negligence or fault " the obscurity arose. In this article the term is manifestly used as more especially denoting intentional wrong

doing.  And again it is used in this sense in Art. 2370, which provides that the husband is not liable where the dowry was not lost through his "fault or neglect."

But the article in which the term is used in immediate connection with the subject we are now considering, is Art. 2315.  This article declares that: "Every act whatever of man that causes damage to another, obliges him by whose fault it happened to repair it."

The article just cited is a literal translation of Art. 1382 of the Code Napoleon.  The commentators are all agreed that the term "faute" in this article means both intended and unintended infringement of the rights of others.  For example, Mourlon, commenting on Art. 1382, says:  "La faute est un délit lorsque l'argent du dommage l'a causé avec intention ; un quasi-délit dans le cas contraire."  (Vol. 2, p. 892.)

So Marcadé, vol. 5, p. 265:  "La loi s'occupe simultanément des délits et des quasi-délits dans les Arts. 1382 et 1383, puisqu'elle y consacre l'obligation résultant de tout acte préjudiciable et fautif sans distinguer se cet acte a été ou n'a pas été accompagné de l'intention de nuire."

And Laurent, vol. 20, p. 406:  "La loi prend le mot 'faute' dans sa plus large acception ; il comprend toutes les causes d'imputabilité, depuis le dol jusqu'a la plus légère imprudence ; donc les délits aussi bien que les quasi-délits."

In other words, the term "fault" in our Code is "nomen generalissimum." and designates intentional wrongs as well as those which happen through negligence or inadvertence. "Fault" is thus the generic term ; negligence a specific term.  "Fault" denotes all wrongs, both intentional and unintentional ; "negligence" denotes only unintentional wrongs.

When, therefore, our Code defines "fault," and distinguishes its several divisions, it is illogical to claim that the definition and division given are intended to apply also "negligence."

But it may be urged though "fault" is sometimes used as a generic term, yet in the definition of it given in our Code it is taken in a narrower sense, as the equivalent of negligence.

There does not seem to be any ground for this assumption, but if it were conceded, the only result would be to make the definition unmeaning.  For, if we assume that by "fault" is intended "negligence" in this definition and substitute the latter term for the former, the definition would then read thus:  "The gross negligence is that which proceeds from inexcusable negligence or ignorance."

More briefly:  "Gross negligence is inexcusable."

So is ordinary or slight negligence.  The doer of an injury is liable whether his negligence was gross or ordinary.  Gross negligence and slight negligence would thus be confounded and identified by the very definition which is supposed to distinguish them.

The assumption that "culpa" is used and defined in the Roman law as a technical term, signifying simply what "negligence" signifies in our law is, in our judgment, equally unfounded.  The term "culpa" is used in the Roman law with a signification as broad as that which "faute" has in the French law, or which "fault" or "wrong" has in our law.  For example:  It was a rule of the Roman law that responsibility did not attach for failure to prevent an injury which it was out of the power of him who foresaw it to prevent—"Culpa caret, qui scit, sed prohibere non potest," l. 50 de diversis regulis.  He is without fault, etc.  And where vis major is declared to release from responsibility, the language is "Ejus vero nulla culpa est, cui parere necesse sit.  (L. 169 Id.)  That is, though the act was intended, it was without fault.  So, a surgeon who deliberately abandons a patient, after amputating a limb, and when he must know that such abandonment will endanger the patient's life, is declared to be culpæ reus (Inst. Lib. IV, T. 3, 96), that is, guilty of a legal fault which, by hypothesis, is intentional, not inadvertent.

The "culpa" to which the Aquilian law related was, of course, usually that form of "fault" which results from negligence.  But, as we have just seen, the term was, by no means,

Socola vs. Chess-Carley Company.

invariably used in this restricted sense. The definitions cited from the 16th title of the 50th Book of the Pandects, are unsatisfactory and of little value, as they are simply a few pointed expressions taken from the context which showed the particular phase of "culpa" which the author was discussing. It seems, probable, however, as Pothier intimates in his edition of the Pandects, that these definitions relate to negligent breaches of duty in connection with the several contracts of bailment. The comparison of great negligence with intentional wrong-doing, has a significance and propriety in these particular relations which are altogether wanting in the case of "culpa" unconnected with contract.

We see, then, that "culpa," in the Roman law, is either "fault," and thus a term of much wider significance than "negligence;" or else it is that phase of negligence which is shown in connection with the contracts of bailment, and so, in this restricted sense, as much too narrow, as in its more general sense it is too wide. In either sense it is not negligence unconnected with contract, and therefore is not the matter we are now discussing. We may remark here, that the mediæval and modern attempts to classify and divide negligence have appeared in professed treaties on bailments, and the cases stated to establish and illustrate the divisions are drawn from those contracts. The efforts to extend this classification and division to negligence, unconnected with contract, has given rise to infinite confusion.

As the Roman law and code definition throw no light on the subject, we must consult the anglo-American text writers and decisions, with whose principles and terminology our jurisprudence on the subject of negligence is much more closely connected than it is with the Roman law. For it should be observed that the term "gross negligence or carelessness" appears not in the Code, but in a very modern statute—one passed in 1877 The term is a recognized technical term, of every day occurrence in general American jurisprudence, and its meaning has been extensively discussed by courts and authors during the past half century. The literature on the subject is found in all the works on torts, negligence and damages, which make a part of the working library of every lawyer in the State. It is far more likely, then, that the term was used in the sense familiar to the Legislature which enacted the law, than in a sense which learned research might disputably and doubtfully give it in the Roman law.

2d. The sense of gross negligence or carelessness in anglo-American jurisprudence.

Modern judges and text writers have, with great unanimity, repudiated the attempt to engraft on the general law of negligence unconnected with contract the distinctions elaborated by mediæval choialists as to negligence in connection with the several contracts of bailment.

Says Sutherland, J. in Wells vs. R. R. Co., 24 N. Y. 186: "It has been doubted of late whether the formal division or classification of negligence in the abstract into gross, ordinary and slight, recognized in the books, has been useful; indeed, whether it has not tended to produce confusion. This classification of negligence which grew out of the classification of bailments, and which has been considered more particularly applicable to questions of negligence between bailor and bailee, is founded upon but one circumstance, that is, the circumstance of the benefit to the bailor, or to the bailee, or of mutual benefit. This circumstance, either of mutual benefit, or of benefit to one or other of the parties only, being a circumstance common to all bailments, was made the foundation or principle of the classification ; but it is evident, from the very nature of the subject, that it is and must be a mere abstract, philosophical classification, of little or no use in practice. Courts deal with cases."

In another case (Perkins vs. Railroad Co. p. 206), in the same volume, the organ of the Court says: "I think, with Lord Denman, who, in Hinton vs. Dibbin (2 Q. B. 661), said: 'It may well be doubted whether between gross negligence and negligence merely, any intelligible distinction exists.' Judge Curtis (in 16 How. 474) also says:

Socola vs. Chess-Carley Company.

'It may be doubted whether the terms slight, ordinary and gross negligence can be usefully applied in practice.'

"The difficulty of defining gross negligence, and the intrinsic uncertainty pertaining to the question, as one of law, and the utter impracticability of establishing any precise rule on the subject, renders it unsafe to base any legal decisions on distinctions of the degrees of negligence."

The Supreme Court of Massachusetts has announced the same view in Gill vs. Middleton, 105 Mass. 478, where they say: "The law furnishes no definition of gross negligence, as distinguished from want of reasonable and ordinary care, which can be of any practical utility.    *    *    *    The degrees of negligence, so often spoken of in the text books, do not admit of such precision and exactness of definition as to be of any practical advantage in the administration of justice, without a detail of the facts which they are intended to designate."

The Supreme Court of the United States has also reached the conclusion that the distinction between gross and ordinary negligence is impossible of definition or practical application.

In Steamboat vs. King, 16 How. 474, the Court say: "It may be doubted if these terms can be usefully applied in practice. Their meaning is not fixed, or capable of being so. One degree thus described not only may be confounded with another, but it is quite impracticable exactly to distinguish them.    *    *    *    If the law furnishes no definitions of the terms 'gross negligence,' or 'ordinary negligence,' which can be applied in practice, but leaves it to the jury to determine in each case what the duty was, and what omissions amount to a breach of it, it would seem that imperfect and confessedly unsuccessful attempts to define that duty had better be abandoned."

Subsequently, in R. R. Co. vs. Arms, 91 U. S. 494, they quote, with approval. the case last cited. They say that they have there "expressed their disapprobation of these attempts to fix the degrees of negligence by legal definitions." Further on, after quoting, with approval, the English cases, they say,    "*    *    but, after all, it (gross negligence) means the absence of the care that was necessary under the circumstances."

The English cases are equally clear. In Wilson vs. Brett, 11 M. & W., 113, it is said that "gross negligence is ordinary negligence, with a vituperative epithet." And in Gill vs. General, etc., Co. (L. R. C. P. 1), the Court, after repudiating the distinction between gross and ordinary negligence, remark: "Gross is a word of description, and not of definition, and it would be only introducing a source of confusion to use the expression, 'gross negligence,' instead of the equivalent, 'a want of due care and skill.'"

Finally, Chancellor Kent long ago declared that 'gross neglect is the want of that care which every man of common sense, under the circumstances, takes of his own property. (2 Com. 560.) This definition, it will be observed, confounds gross and ordinary negligence, as understood by plaintiff's counsel. A recent English writer (Smith on Negligence, p. 21) remarks: "The words 'ordinary' and 'reasonable' are, no doubt, vague; but the subject is only further obscured by the introduction of the words, 'gross' and 'slight,' because nobody can really say what they mean, though anybody may easily give to them some peculiar or exaggerated meaning."

The opinion of the Court was delivered by

Poché, J.    This is a suit for damages in the sum of $17,275, in which plaintiff appeals from a judgment rejecting his demand.

The principal facts are as follows:

A rice mill, situated in the parish of Plaquemines, about 45 miles below this city, and owned by plaintiff, was totally destroyed by fire on the night of September 11, 1885.

The fire originated in a warehouse adjoining the mill, in which was stored a barrel of petroleum oil or fluid, used for illuminating purposes when the mill was run at night. While two of the mill employees were engaged, a short time after midnight, in drawing some oil from the barrel, in order to replenish the lamps of the mill, an apparently spontaneous combustion occurred in the room, which ignited the barrel. The fire then spread from the warehouse to the mill, which was in a short time destroyed with all its appurtenances.

The barrel of oil or fluid had been purchased by plaintiff from the defendant company, by which it had been shipped by boat to the mill on the 7th of September, according to plaintiff's directions.

In his pleadings, plaintiff holds the defendant company responsible for the destruction of his mill, for the following reasons, substantially:

1st. That his order of September the 7th was for a barrel of "puroline," a burning fluid extensively used in illuminating sugar-houses and rice mills with safety, and that instead thereof, the defendant shipped to his mill a barrel of "gasoline," an exceedingly dangerous fluid.

2d. That with a fraudulent design the defendant caused the barrel of "gasoline" thus shipped to his mill, to be branded as "puroline," and purposely omitted to mark said barrel of oil, as "dangerous and explosive," as required by law.

3d. That through the deception thus practiced on him by the defendant, plaintiff used said "gasoline" in his mill contrary to a prohibition against the use of the same, in the fire insurance policy which he held, in consequence of which he was defeated in an action which he instituted in the Circuit Court of the United States, Eastern District of Louisiana, for the recovery of the amount of said policy.

4th. That the fire resulted from defendant's fraudulent substitution of "gasoline" for "puroline," and not through the carelessness or negligence of plaintiff or of his employees.

Hence he claims damages for the value of his mill and appurtenances which he fixes at $11,275, and for the profits, which he lost by the fire during that season, in the sum of $6000.

The defense is a general denial, followed by the special averments that the article which was delivered to plaintiff was a fluid of the nature and quality which he had ordered; that the barrel was marked "explosive and dangerous;" that the damages sustained by plaintiff

were brought about by his gross carelessness and negligence, in making use of said fluid in an improper manner.

The pivotal point in the controversy is the alleged deception practiced on the plaintiff by the defendant, in the substitution of "gasoline" for "puroline," and designedly omitting to brand the barrel with the words "explosive and dangerous."

Its proper discussion involves an investigation of the difference which may exist between the dangerous and explosive character of the two fluids.

In this connection the voluminous record in the case discloses to our minds the following facts:

"Puroline" and "gasoline" as sold and used for illuminating purposes are both petroleum products, and both are gas generating fluids. From the testimony of chemists, and of other experts, and of dealers in such articles, it appears to our entire satisfaction, that the difference of danger between "puroline" and "gasoline" of 74° gravity, is so slight and insignificant that it is hardly measurable, or, even perceptible.

It also appears that in the trade, orders for "puroline" are frequently and almost usually filled by delivering 74° "gasoline." And circulars issued and distributed all over the State by different dealers in these articles, contain the statement that 74° "gasoline" is of the same gravity as "puroline." In both, the danger is not from explosion while burning in lamps, but from handling in the proximity of a light, on account of the gas which they generate and liberate from packages which are not air-tight, and which gas is inflammable.

Under the provisions of Act 37, approved April 2, 1877, entitled an act "To provide for gauging and inspecting coal oils and illuminating oils or fluids, derived wholly or in part from coal or petroleum, to regulate the sale or disposition of the same," etc. An inspector is appointed in the city of New Orleans to carry out the purposes of the act.

Among other duties which are imposed on him by the act, the inspector is required after inspection, to brand the barrel or other vessel containing any such products of coal or petroleum, whose flashing point shall be less than 125°, with the words " explosive and dangerous," to be stamped with stencil or otherwise in a conspicuous place.

Now the present inspector, who has been in office since 1880, testifies that in his inspection he ranks " puroline " and " gasoline " alike as to the flashing point, and that he invariably brands them both as " explosive and dangerous," and from the testimony of his predecessor's deputy, it appears that the same rule was followed in his time.

Socola vs. Chess-Carley Company.

It is in proof that plaintiff, who resides in this city, had entrusted the management of his mill to an agent who was to participate with him in the profits of the enterprise, and that the barrel of oil had been ordered at his request, which was based on his experience in the use of that kind of illuminating fluid. Plaintiff himself was not familiar with it, and was throughout these transactions guided by the judgment of his agent, to whom the bills for all supplies sent to the mill were forwarded, and they were paid only on his approval.

Now, it appears that on the 13th of August previous, a similar order had been filled by the defendant, who had shipped thereunder precisely the same article, which was delivered on the 7th of September, stamped in the same manner, and that the bill which the company presented described the goods delivered as "*gasoline*, 74°." The bill was forwarded to the agent, the fluid was used by him, and no complaint was made by him or by plaintiff.

The agent had died before the trial of this case, and the Court is thus deprived of the benefit of his testimony on a subject peculiarly within his knowledge.

We conclude that the mere substitution of "gasoline, 74°," for "puroline," under circumstances showing that the difference is only in the name of the goods, was not deception or fraud on the part of defendant.

But plaintiff's main contention on this point is that the barrel under discussion was not branded in the manner required by law, with the words "explosive and dangerous," and that the omission in that particular was part of the scheme of deception practiced on him by the defendant.

He rests that part of his case on the testimony of five witnesses, all employees in and about his mill, who testify that they saw the barrel in question after it had been landed from the boat, and that it did not contain the words "explosive and dangerous."

These witnesses were skilled laborers at rice-milling; neither of them was entrusted with the care or control of the lamps or of the oil used therein; that duty was incumbent on another employee, whose testimony was not taken. They did not, and they do not even pretend that they did, examine the barrel in a particular manner, or with a definite object in view, and their testimony was given in April, 1886, more than six months after the fire; which had also destroyed the very barrel which was the subject matter of their testimony.

From impressions produced from the stencil plates used by the defendant and by the inspector, it appears that the company stamps one

end of the barrels as follows: "Insurance Oil Tank Co., New Orleans, La., Trade-mark Puroline, 95 and 97 Gravier street, N. O. I. O. T. Co;" and that the inspector brands on the other end the following words: "Eugene Legardeur, Gauger and Inspector coal oils (50) gallons, flashing point, 0 degrees; New Orleans, May, 1886. Explosive and dangerous."

In both inscriptions the words are grouped together in a circular form, the circle in the inspector's brand being not quite completed, so as to leave room for the address of the purchaser or consignee.

Now, the witnesses who have testified on this point, when asked to specify the particular inscriptions which they had noticed on the barrel in question, all stated with striking unanimity that they had seen the following words: "Chess-Carley Company, Puroline, 50 Galls."

It thus appears that they saw words which are not at all in either stencil plate, which is branded puroline, and that they saw the word "gallons" on that end of the barrel which never contains that word according to the stencil plates. These circumstances illustrate the natural unreliability of human memory, as well as the innate weakness of negative testimony. The same uncertainty is further illustrated by the testimony of one of those witnesses, who had gone from this city to the mill on September 9, on a steamboat, and who could not remember the name of the boat on which he had made the journey, but who remembered specially the letters which were inscribed on the end of the barrel.

In contrast with this testimony which leaves the judicial mind in a state of painful uncertainty and doubt, we have that of the inspector and his deputy, and of several clerks, warehousemen and other employees of the defendant, who state positively that no barrel oil or fluid leaves the warehouse without inspection, and without the proper brand. One of the clerks remembers the brand and the address of plaintiff on the barrel, which corresponds in date with the order of September 7, and with the entry in the shipping or delivery book.

Postive testimony on a given point always predominates over negative testimony on the same point. Story vs. Insurance Co., 37 Ann. 255; Guesnard vs. Bird, 33 Ann. 796.

We conclude that the barrel of oil shipped to plaintiff by the defendant on September 7, 1885, did contain in a conspicuous place the words "explosive and dangerous," and that the company is not amenable in this suit to the penal clause in the act of 1877, which reads as follows: "Any person, firm, company or corporation, violating any of the provisions of this section, shall be liable to a penalty not exceeding

the sum of two hundred dollars for each and every offense. It is further provided that, in the event of any injury or damage to person or property resulting from or caused by such oil or fluid not so stamped, the party thus suffering shall have a right of action in damages against the person, firm, company or corporation selling, giving or delivering such oil or fluid, for the full amount of such injury or damage, together with all costs of court. * * * Provided further, that such injury or damage shall not have been the result of gross negligence or carelessness."

We now reach the point at which we must consider what cause in our opinion led to the destruction of the mill.

As already shown in this opinion, the consumers of the oil or fluid which had been shipped to plaintiff on the 7th of September, 1885, were warned of its dangerous character under the authority of the State itself, by means of the stamp which she required from all dealers in that kind of illuminating oil.

It is also in proof that with every package containing such fluid, even when stamped with the trade-mark "Puroline," the dealers sent to their customers printed circulars containing directions for the proper use of the fluid.

These circulars contained cautions of which the following is a sample:

"Puroline is absolutely non-explosive, but like alcohol is inflammable; therefore, the reservoir should not be filled when the gas is burning or near a flame. *Lamps should always be filled in day time.*"

It also appears that from the volatile character of the fluid, the principal danger was from the generating and liberating of gas, if the package was not air-tight. Hence in the warehouse great caution is exercised in that direction, in trying to make barrels as safe as possible by fresh paint outside and by means of glue inside.

All these circumstances and elements of danger were known to the agent, who, in consequence had placed the whole control and management of the lamps and fluids under the exclusive charge of one man, and had issued orders forbidding the handling of fluids in order to replenish the lamps, at night, or soon after 5 o'clock p. m.

But it happened that the man in charge of that department was sick at the time that the barrel was delivered at the landing during the night of September 7, and that the barrel was not stored for two days during which time it laid exposed to a September sun in Louisiana. It ceases to be a subject of wonder to account for the gas which was subsequently liberated from that barrel.

23

Socola vs. Chess-Carley Company.

Now, it appears that in spite of all these elements of danger, of all these warnings and conditions, and in utter disregard and violation of the rules of the mill, two employees went into the room where that barrel was stored at midnight, with a burning lantern, in order to draw therefrom the fluid needed to replenish some of the lamps used in the mill. The result was the fire which destroyed the mill and subjected its owner to a heavy loss.

For the purpose of our decree it is not necessary that we should charge the loss to the gross carelessness or negligence of plaintiff, or of his employees, but we are thoroughly convinced that plaintiff has utterly failed to fasten responsibility therefor on the defendant company.

In view of plaintiff's averment that, owing to the use of "gasoline" as an illuminating fluid in his mill, under the deception practiced on him or his agent by the defendant, he had been defeated in his suit for the recovery of the insurance thereon, we have given full and more than ordinary consideration to every feature of his case, and to every circumstance which might tend to relieve him from the hardship of an entire loss, notwithstanding his prudent caution on the subject of insurance. But we are powerless to afford him any relife on the score of his lost policy. We have no concern with the judgment rendered in that controversy by a court of competent jurisdiction and of his own choice.

We have even no means of ascertaining the precise ground on which the insurance company was relieved of the burden of its contract.

But, in so far as our record goes, we are inclined to think that the assertion that the judgment of the Circuit Court vested solely on the broken condition which prohibited the use of "gasoline" in the mill, is not borne out.

The condition in the policy reads : "The generating or evaporating within the building, or contiguous thereto, of any substance for a burning gas, or the use of gasoline for lighting, is prohibited."

Now, the Circuit Court may have had evidence satisfactory to show that under the prohibition there was no practical difference between "puroline" of 68° and "gasoline" of 74°.

We noted also that in its answer the insurance company had set up the additional defense that plaintiff had run his mill at night without previously obtaining the company's written consent. In its reasons

for judgment the Circuit Court "finds the issues of fact in favor of the defendant," and it is not a violent presumption to believe that the judge had considered both grounds of defense as good.

It is thus clear to our minds that that judgment and our decree are not absolutely irreconcilable, and both may stand in law and justice, on their respective grounds.

Judgment affirmed.